No. 98-079

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 171

295 Mont. 212

983 P.2d 916

STATE OF MONTANA,

Plaintiff and Respondent,

v.

ROBERT DAWSON,

Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Maurice R. Colberg, Jr., Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Richard J. Carstensen, Billings, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, John Paulson, Assistant Attorney General; Dennis Paxinos, Yellowstone County Attorney, Melanie B. Logan, Deputy Yellowstone County Attorney, Billings, Montana

Submitted on Briefs: December 30, 1998

Decided: July 15, 1999

Filed:

_____

Justice James C. Nelson delivered the Opinion of the Court.

**¶1. Robert Dawson (Dawson) pleaded guilty to one count of felony possession of methamphetamines and one count of misdemeanor possession of drug paraphernalia after**

the District Court for the Thirteenth Judicial District, Yellowstone County, denied Dawson's motions to suppress evidence obtained in a search of his person and a statement Dawson made to law enforcement officers prior to that search. In pleading guilty, Dawson reserved the right to appeal the District Court's adverse rulings on his motions. Hence, Dawson now appeals his conviction and sentence and the denial of his motions to suppress. We affirm.

**¶2. We address the following issues on appeal:**

**¶3. 1. Did the District Court properly deny Dawson's motion to suppress which was based on Dawson's claim that law enforcement officers lacked particularized suspicion for an investigative stop and frisk?**

**¶4. 2. Did the District Court properly deny Dawson's motion to suppress which was based on Dawson's claim that law enforcement officers failed to give Dawson his *Miranda* warnings before conducting a custodial interrogation?**

### Factual and Procedural Background

**¶5. On December 18, 1996, law enforcement officers from the Billings Police Department were conducting surveillance of a room at the Parkway Motel in Billings. The room had been rented by Jeremy Roehr, a known criminal. The officers**

suspected that the room was being used for illegal activities, including transactions involving stolen merchandise, bad checks and dangerous drugs. During their surveillance, officers observed several individuals entering and leaving the room throughout the day.

¶6. That evening, Officer Jeremy House assisted other law enforcement officers in the execution of a search warrant for the motel room. Officer House provided security for the detectives who were conducting the search and interviewing the occupants of the room. At about 11 p.m., Officer House, who was standing just inside the motel room, heard a knock at the door. Expecting to see one of the detectives returning to the room, Officer House opened the door. As he did so, Dawson walked into the room and asked for Jeremy. When Officer House realized that Dawson was not a detective, he informed Dawson that he was a police officer and that they were conducting a search of the room.

¶7. Officer House later testified that he told Dawson that he was going to conduct a pat-down search of Dawson's person for weapons. However, before doing so, Officer House asked Dawson if he had any weapons, drugs, or needles on his person. Dawson responded that he had no guns. Finding this response unsatisfactory, Officer House asked Dawson again if he had any weapons, drugs, or needles. Dawson motioned toward his left coat pocket and said that he had some "smoke" in there. Officer House, who understood the term "smoke" to be a slang or street term for illegal drugs, reached into Dawson's coat pocket and removed a black pouch containing what he believed to be illegal drugs. Officer House then arrested Dawson for criminal possession of dangerous drugs.

¶8. On December 23, 1996, Dawson was charged by Information with one count of criminal possession of dangerous drugs, a felony, in violation of § 45-9-102, MCA, and one count of criminal possession of drug paraphernalia, a misdemeanor, in violation of § 45-10-103, MCA. The Information alleged that on December 18, 1996, Dawson possessed a quantity of the drug methamphetamine as well as several items of drug paraphernalia including plastic vials, baggies, and razor blades.

¶9. On March 10, 1997, Dawson filed two motions. In the first motion, Dawson sought to suppress the evidence obtained in the search of his person. Dawson contended that the search was illegal as Officer House did not have an articulable, reasonable suspicion that Dawson had engaged in criminal activity. In the second

motion, Dawson sought to suppress his statement regarding the "smoke." He contended that Officer House failed to advise him of his *Miranda* rights prior to conducting a custodial interrogation from which the statement regarding "smoke" was elicited.

¶10. A hearing on Dawson's motions was conducted on April 11, 1997. At that time, testimony was received from both Dawson and Officer House. Dawson testified that he went to the motel room to ask Roehr about a set of keys to his sister's car. Dawson claimed that, contrary to Officer House's testimony, when Officer House opened the door and saw him standing there, Officer House grabbed him, pulled him into the room and tossed him up against a wall. Dawson also testified that he used the term "smoke" to refer to his cigarettes.

¶11. The District Court entered an order on June 25, 1997, denying both of Dawson's motions to suppress. On July 10, 1997, Dawson pleaded guilty to the charges and reserved his right to appeal the District Court's adverse ruling on his motions. The court sentenced Dawson to three years with the Department of Corrections on the felony possession charge and six months on the misdemeanor drug paraphernalia charge. The court ordered that the sentences were to run concurrently.

¶12. Dawson appeals his conviction and sentence and the denial of his motions to suppress. The District Court released Dawson on his own recognizance, subject to conditions, pending his appeal.

## Standard of Review

¶13. The standard of review of a district court's denial of a motion to suppress is whether the court's findings of fact are clearly erroneous, and whether those findings were correctly applied as a matter of law. *State v. Parker*, 1998 MT 6, ¶ 17, 287 Mont. 151, ¶ 17, 953 P.2d 692, ¶ 17 (citing *State v. Roberts* (1997), 284 Mont. 54, 56, 943 P.2d 1249, 1250).

## Issue 1.

¶14. *Did the District Court properly deny Dawson's motion to suppress which was based on Dawson's claim that law enforcement officers lacked particularized suspicion for an investigative stop and frisk?*

¶15. The District Court concluded that pursuant to §§ 46-5-401, 402 and 403, MCA, and this Court's decision in *State v. Broken Rope* (1996), 278 Mont. 427, 925 P.2d 1157, regarding investigative stops, Officer House possessed the requisite objective data and resulting suspicion to lawfully stop and frisk Dawson. Thus, the court denied Dawson's motion to suppress the evidence obtained from the investigative stop and frisk.

¶16. Dawson contends that the court erred in determining that Officer House had sufficient cause to temporarily detain and frisk him. Dawson argues that merely knocking on a motel room door at 11:00 p.m. cannot create a particularized suspicion of illegal activity.

¶17. When a law enforcement officer seizes a person, the right against unreasonable searches and seizures guaranteed by the Fourteenth Amendment to the United States Constitution applies. *Broken Rope*, 278 Mont. at 430, 925 P.2d at 1159 (citing *Bauer v. State* (1996), 275 Mont. 119, 125, 910 P.2d 886, 889). In *Broken Rope*, this Court reiterated the two-part test set forth in *State v. Gopher* (1981), 193 Mont. 189, 631 P.2d 293, to determine whether a law enforcement officer has sufficient cause to stop an individual. Under this test, the State must first establish objective data from which an experienced officer can make certain inferences. The State must then show a resulting suspicion that the person is, or has been, engaged in wrongdoing. *Broken Rope*, 278 Mont. at 430-31, 925 P.2d at 1159 (citing *Anderson v. State Dept. of Justice* (1996), 275 Mont. 259, 263, 912 P.2d 212, 214).

¶18. Section 46-5-401, MCA, was amended in 1991 to reflect our decision in *Gopher*. This statute now provides:

**Investigative stop.** In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create *a particularized suspicion* that the person or occupant of the vehicle *has committed, is committing, or is about to commit an offense.*

Section 46-5-401, MCA (emphasis added). The question of whether a particularized suspicion exists is a question of fact which is dependent on the totality of the circumstances. *Broken Rope*, 278 Mont. at 431, 925 P.2d at 1159 (citing *Anderson*, 275

Mont. at 263, 912 P.2d at 214; *State v. Reynolds* (1995), 272 Mont. 46, 50, 899 P.2d 540, 542-43). Moreover, a particularized suspicion does not require certainty on the part of the law enforcement officer. *State v. Olmstead*, 1998 MT 301, ¶ 34, 968 P.2d 1154, ¶ 34, 55 St.Rep. 1235, ¶ 34 (citing *State v. Morsette* (1982), 201 Mont. 233, 241, 654 P.2d 503, 507).

**¶19. In the case *sub judice*, there was sufficient evidence presented at the suppression hearing to show the existence of objective data from which Officer House, an officer with seven years of law enforcement experience, could make certain inferences. *Broken Rope*, 278 Mont. at 431, 925 P.2d at 1159. Law enforcement officers were in the process of executing a search warrant at the motel room of Jeremy Roehr, a known criminal. The officers had the room under surveillance for several hours prior to obtaining the search warrant and, in that surveillance, they observed several people entering and leaving the room. The officers had probable cause to believe that Roehr was conducting transactions involving dangerous drugs and stolen property in his motel room. Thus, when Dawson appeared at Roehr's motel room at 11 p.m. asking for Jeremy, Officer House had a particularized suspicion, based on the totality of the circumstances, that Dawson had committed or was about to commit an offense. Consequently, Officer House had sufficient cause to detain Dawson. Section 46-5-401, MCA; *Broken Rope*, 278 Mont. at 431, 925 P.2d at 1159.**

**¶20. In addition, § 46-5-403, MCA, provides that "[a] stop authorized by 46-5-401 or 46-6-411 may not last longer than is necessary to effectuate the purpose of the stop." In this case, the search occurred within two or three minutes of Dawson entering the room and lasted only a few minutes.**

**¶21. Since we have concluded that Officer House had lawfully detained Dawson, we must next examine whether Officer House had sufficient cause to search Dawson once he had been detained. To that end, § 46-5-402, MCA, provides:**

**Stop and frisk**. A peace officer who has lawfully stopped a person under 46-5-401 or this section:

(1) *may frisk the person and take other reasonably necessary steps for protection if the officer has reasonable cause to suspect that the person is armed and presently dangerous to the officer or another person present;*

(2) may take possession of any object that is discovered during the course of the frisk if the officer has probable cause to believe the object is a deadly weapon;

(3) may demand the name and present address of the person; and

(4) shall inform the person, as promptly as possible under the circumstances and in any case before questioning the person, that the officer is a peace officer, that the stop is not an arrest but rather a temporary detention for an investigation, and that upon completion of the investigation, the person will be released if not arrested.

Section 46-5-402, MCA (emphasis added).

**¶22. Furthermore, in *Michigan v. Summers* (1981), 452 U.S. 692, 101 S.Ct. 2587, 69 L. Ed.2d 340, the United States Supreme Court recognized the importance of minimizing the risk to law enforcement officers who are engaged in the execution of a search warrant. In upholding a temporary detention during a warrant search under the principles enunciated in *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889, the Supreme Court noted that the execution of a search warrant for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. Thus, the Supreme Court determined that the risk of harm to both the officers and the occupants of the premises being searched would be minimized if the officers routinely exercised unquestioned command of the situation. *Michigan*, 452 U.S. at 702-03, 101 S.Ct. at 2594.**

**¶23. Similarly, in the case before us on appeal, Officer House testified that, in his experience, people involved with illegal drugs are more likely to carry weapons. In fact, Officer House testified that a month prior to the search in this case, while he was assisting officers in the execution of another search warrant, Officer House opened the door in response to a knock and the person who entered the premises pulled a knife on the officers.**

**¶24. In contrast, in our recent decision in *State v. Anderson*, 1999 MT 60, ___ P.2d ___, 56 St.Rep. 252, we concluded that the warrantless search of Anderson's person was unreasonable and violated Anderson's constitutional right to be free from unreasonable searches, thus we held that the District Court erred in denying Anderson's motion to suppress. *Anderson*, ¶26. Although *Anderson* also involved a**

search for illegal drugs and drug paraphernalia, it is distinguishable from the case before us on appeal because the search of Anderson's person was not conducted to search for weapons in the interests of protecting the officer's safety as was the situation in the present case. The officers in *Anderson* had prior experiences with Anderson wherein he had never resisted arrest or otherwise posed a danger to the officers. The officers noted that Anderson sat quietly on the couch while they conducted the search and that they did not believe him to be dangerous or to be carrying a weapon.

**¶25. Conversely, in the present case, Officer House had not had prior dealings with Dawson, therefore, Officer House did not know whether Dawson posed a danger to the officers conducting the search. Hence, we conclude that Officer House had reasonable cause to suspect that Dawson was "armed and presently dangerous" to the officers conducting the search of the motel room. Section 46-5-402, MCA.**

**¶26. In addition to the provisions of §§ 46-5-401 and 402, MCA, the State argued before the court below and now in its brief on appeal, that § 46-5-228(2), MCA, also justified the search of Dawson's person. This statute provides, in pertinent part:**

(2) The person serving the search warrant may reasonably detain and search any person *on the premises* being searched *at the time of the search*:

(a) *for self-protection*; or

(b) to prevent the disposal or concealment of any evidence, contraband, or persons particularly described in the warrant.

Section 46-5-228(2), MCA (emphasis added). When Dawson entered the motel room during the execution of the search warrant, he was "on the premises" "at the time of the search" and thus subject to temporary detention and a search for the "self-protection" of the officers at the scene. Section 46-5-228(2), MCA.

**¶27. Based on all of the foregoing, we conclude that Officer House possessed the requisite objective data and resulting suspicion to lawfully stop and frisk Dawson. Accordingly, we hold that the District Court did not err in denying Dawson's motion to suppress the evidence obtained from the investigative stop and frisk.**

# Issue 2.

**¶28.** *Did the District Court properly deny Dawson's motion to suppress which was based on Dawson's claim that law enforcement officers failed to give Dawson his Miranda warnings before conducting a custodial interrogation?*

**¶29. Dawson contends that Officer House was required to advise Dawson of his rights pursuant to** *Miranda v. Arizona* **(1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, prior to asking Dawson whether he had any weapons, drugs or needles on his person. As a result of Officer House's failure to advise him of those rights, Dawson argues that his statement about the "smoke" in his pocket should have been suppressed and that the District Court erred in failing to do so.**

**¶30. The necessity of prior** *Miranda* **warnings turns on whether Dawson was subjected to custodial interrogation at the time of his response to Officer House's questions.**

Two requirements must be met before Miranda is applicable; the suspect must be in "custody," and the questioning must meet the legal definition of "interrogation." . . . A person is "in custody" for the purposes of Miranda if he "has been deprived of his freedom of action in any significant way," or his freedom of action has been curtailed to a "degree associated with a formal arrest."

*United States v. Ritchie (10th Cir. 1994), 35 F.3d 1477, 1485 (citations omitted).*

**¶31. In** *Ritchie***, law enforcement officers suspected Ritchie of committing an armed robbery. Several officers detained Ritchie while waiting for another officer to arrive with a search warrant for Ritchie's home. During the detention, an officer conducted a quick pat-down search of Ritchie's person. When the officer arrived with the search warrant, he informed Ritchie that he was going to conduct another pat-down**

search for weapons. The officer asked Richie if he had anything in his pockets. Ritchie, who had not been given his *Miranda* rights prior to the question, removed some money from his pockets and handed it to the officer. This money was later identified as part of the money taken in the robbery. *Ritchie*, 35 F.3d at 1479-80.

¶32. Prior to trial, Ritchie tried to suppress this evidence by invoking *Miranda*. The federal appeals court concluded that Ritchie had not been "in custody," as that term is defined by *Miranda* and subsequent cases, and that *Miranda* warnings are not required to be given prior to a pat-down search and related questioning. *Ritchie*, 35 F.3d at 1485.

Traditionally *Miranda* warnings are not required in stops pursuant to Terry v. Ohio, 392 U. S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), because "the typical police-citizen encounter envisioned by the Court in Terry usually involves no more than a very brief detention without the aid of weapons or handcuffs."

*Ritchie, 35 F.3d at 1485 (quoting United States v. Perdue (10th Cir. 1993), 8 F.3d 1455, 1464). While the Ritchie court determined that an investigative stop may, in some circumstances, require law enforcement officers to employ a greater amount of force and thus create a custodial situation, temporary detention during the execution of a search warrant is not so coercive as to require Miranda warnings prior to any questioning. Ritchie, 35 F.3d at 1485.*

¶33. In the case *sub judice*, the District Court also relied upon this Court's decision in *State v. Rushton* (1994), 264 Mont. 248, 870 P.2d 1355, in denying Dawson's motion to suppress his statement. In *Rushton*, we stated that the determination of whether a "custodial interrogation" has occurred is made on a case-by-case basis and looks to whether a "reasonable person" would feel free to leave after considering such factors as the time and place of the questioning, the length and mood of the questioning, and the presence of other persons during the questioning. *Rushton*, 264 Mont. at 256, 870 P.2d at 1360 (citing *State v. Lapp* (1983), 202 Mont. 327, 331, 658 P.2d 400, 403; *State v. Staat* (1991), 251 Mont. 1, 6, 822 P.2d 643, 646).

¶34. As the District Court noted in this case, Dawson was questioned at 11 p.m. in a motel room and, although the mood in the room was tense because of the officer's suspicions, the questioning only took two or three minutes and there were several other people present during the questioning. Hence, the court correctly determined that the investigative stop in this case did not ripen into a custodial interrogation

requiring *Miranda* warnings because the questions posed by Officer House were routine, Dawson's detention was brief, and the protective frisk occurred within the view of the others in the room. *See City of Billings v. Skurdal* (1986), 224 Mont. 84, 89, 730 P.2d 371, 374 (citing *Berkemer v. McCarty* (1984), 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317).

¶35. This Court has previously held that law enforcement officers need not administer *Miranda* warnings to suspects during brief investigative encounters even if those encounters are somewhat coercive. *See State v. Dannels* (1987), 226 Mont. 80, 87, 734 P.2d 188, 193; *State v. Graves* (1981), 191 Mont. 81, 87-88, 622 P.2d 203, 207. Moreover, we have stated that an interrogation is not custodial unless there is a significant restriction of personal liberty similar to an arrest, *Staat*, 251 Mont. at 6, 822 P.2d at 646, and even temporary confinement as a safety precaution does not render the detention "custodial" for *Miranda* purposes, *State v. Woods* (1997), 283 Mont. 359, 368-69, 942 P.2d 88, 94.

¶36. In the case before us, the only "detention" occurred when Officer House turned Dawson around and had him put his hands on the wall so that Officer House could conduct a pat-down frisk. Dawson was not under arrest nor was he in handcuffs at the time. Officer House testified that he frisked Dawson for weapons as a safety precaution because Dawson entered the room while a search was in progress.

¶37. We hold that Dawson was not "in custody" as that term has been defined and narrowed by this Court. Consequently, Officer House was not required to advise Dawson of his *Miranda* rights prior to asking Dawson if he had any weapons, drugs or needles on his person. Therefore, the District Court did not err in denying Dawson's motion to suppress his statement regarding the "smoke" in his pocket.

¶38. Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ JIM REGNIER

/S/ KARLA M. GRAY

Justice W. William Leaphart, specially concurring.

¶39 I concur in the result reached by the Court. I would reach the same result solely on the basis of § 46-5-228(2), MCA, which allows persons serving search warrants to reasonably detain and search any person who is on the premises being searched at the time of the search for purposes of self-protection. As the Court recognizes, when Dawson entered the motel room during the execution of the search warrant, he was on the premises at the time of the search and he was thus subject to temporary detention and to a search for the "self-protection" of the officers at the scene. Having relied on this statutory authority, I would not address the issues of particularized suspicion or the need for *Miranda* warnings.

/S/ W. WILLIAM LEAPHART

Justice Terry N. Trieweiler dissents.

**¶39. I dissent from the majority's resolution of both issues presented on appeal.**

**¶40. I conclude, based on that evidence most favorable to the State, that the arresting officer, Jeremy House, had no particularized suspicion of criminal activity sufficient to detain the defendant, Robert Dawson; that his discovery of illegal contraband was not the result of a protective search for a weapon; and that House's interrogation of Dawson occurred after Dawson was forcibly detained and was, therefore, in violation of Dawson's Fifth Amendment rights.**

**¶41. On the issue of whether Dawson was lawfully detained and searched, it is unnecessary to discuss Dawson's version of events which is very different than Officer House's version. Nor is it necessary to analyze constitutional authorities. The search was unlawful based upon Officer House's own testimony and based on Montana's statutory law.**

**¶42. First, it is necessary to set forth Officer House's testimony. The majority opinion suggests that it was Officer House's intent to search for weapons, but that before he did so, he asked Dawson if he had any "weapons, drugs or needles" and that in response Dawson "motioned toward his left coat pocket and said that he had some 'smoke' in there."**

**¶43. What in fact happened, according to Officer House, was that after Dawson partially entered the room, he told the officer he was looking for Jeremy. Then, according to Officer House:**

Once he was halfway in, once he was right there, I just turned him around, after we identified ourselves, and told him to put his hands on the wall so that we could search him.

**¶44. House testified that once he started the search, Dawson was not free to leave the room. He also gave the following testimony regarding the sequence of events which led to the discovery of the contraband on Dawson's person:**

Q. And then you did not advise him of his Miranda warning before you asked him whether he had weapons or syringes or drugs on his person--

A. He was not under arrest.

Q. --when you searched him?

A. I patted him down. And once he motioned to his upper left-hand coat pocket, I searched that coat pocket.

Q. You searched it because he told you he had smoke in there, and you thought smoke meant drugs?

A. Correct.

Q. You weren't searching that pocket for officer safety at this time then?

A. No.

Q. Did you find any guns, knives or weapons on him?

A. No.

Q. Okay. You found drugs in the pocket where he told you you'd find drugs, correct?

A. Correct. I believe they were in a black pouch inside the pocket.

**¶45. Furthermore, although the majority goes to some length to discuss facts which in the majority's opinion could have given rise to a particularized suspicion of criminal activity, it is clear that at the time House detained, searched, and questioned Dawson, he had no particularized suspicion that Dawson had engaged in criminal activity. He gave the following answers to the following questions at the suppression hearing:**

Q. Was he actually a suspect in any known crime at this time?

A. Not at that time.

. . . .

Q. Okay. You had no articulable suspicion that he had engaged in any type of criminal activity?

A. No.

Q. You had no reason to believe that he was involved in any of the activity that Mr. Roehr was involved in?

A. I was unsure.

Q. You were unsure, but you had no reason to believe that he was then?

A. Correct.

**¶46. Section 46-5-401, MCA, sets forth the only statutory basis for detaining Dawson under the circumstances in this case. It required that he be "observed in circumstances that create a particularized suspicion that the person . . . is committing, or is about to commit an offense." By Officer House's own admission he had no such suspicion and therefore, his detention of House was unlawful.**

¶47. Section 46-5-402, MCA, is the statutory authority relied on by the majority to justify Officer House's frisk and search of Dawson. However, the applicability of § -402 is conditioned upon a lawful stop pursuant to § -401. For the reasons set forth in the preceding paragraph, Dawson was not lawfully stopped or detained. Furthermore, § -402 provides that a person may be frisked if lawfully stopped for protection "if the officer has reasonable cause to suspect that the person is armed and presently dangerous to the officer or another person present"; however, by Officer House's own admission, by the time he searched the pocket where contraband was found, he had already patted Dawson down and concluded that he had no weapon. The pocket where contraband was found was not searched for a weapon. It was searched for illegal drugs. Finally, § -402 does not permit the investigating officer to take possession of illegal drugs if they are found. Subsection (2) permits the officer to take possession "of any object that is discovered during the course of the frisk if the officer has probable cause to believe the object is a deadly weapon." There is no other authority to take possession of anything found as a result of the frisk.

¶48. For these reasons, I conclude that the detention and search of Dawson was unlawful. There was no particularized suspicion of unlawful conduct to justify his detention and there was no suspicion that a weapon would be found when the pocket was searched where the contraband was located.

¶49. The majority and concurring opinions suggest that further authority for the search of Dawson's person is found at § 46-5-228(2), MCA, which allows officers to search a person entering premises where a lawful search is being conducted "for self-protection." However, for the reasons previously mentioned, Dawson's pocket was not searched for Officer House's "self-protection." It was searched after he had already patted down Dawson and concluded that he was unarmed for the purpose of retrieving illegal contraband. Therefore, neither does § 46-5-228(2), MCA, justify the search of Dawson's person.

¶50. Finally, I disagree with the majority's conclusion that Dawson was not in custody at the time he was asked whether he had drugs in his possession. In *State v. Rushton* (1994), 264 Mont. 248, 255-56, 870 P.2d 1355, 1359-60, we stated that:

To determine if a custodial interrogation has occurred, this Court considers each case on a case-by-case basis and looks to whether a "reasonable person" would not feel free to leave

after considering such factors as the time and place of interrogation, the length and mood of interrogation, and persons present during the questioning.

**¶51. Obviously, a "reasonable person" would not have felt free to leave at the time Dawson was asked the question which produced the response that he had "smoke" in his pocket. He had partially entered a motel room when he was forcibly turned around by a person who had identified himself as a police officer and told to place his hands against the wall. He had been patted down for weapons and was then asked again whether he had drugs in his possession. Officer House himself gave the following response to the following question when asked whether Dawson was free to leave during the search:**

Q. So he could have just turned around and walked away, you're telling us?

A. Once I started the search, no. Once he entered the room and just stated he was looking for Jeremy and he wanted to leave, he could have left anytime he wanted to.

**¶52. Aside from the fact that House previously testified that Dawson had been forcibly turned around and told to put his hands up against the wall when he was only partially into the room, it is clear that once that act had occurred he was not free to leave the room. It is equally clear that only after that point in time was he questioned about whether he had drugs in his possession. For these reasons, the interrogation which produced the incriminating statement was custodial, and because Dawson had not been previously advised of his right to remain silent as required by *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, his statement and the evidence which resulted from that statement should have been suppressed.**

**¶53. Therefore, I dissent from the majority opinion. I would reverse the District Court's refusal to suppress the evidence gathered from the defendant as a result of his unlawful detention, unlawful search, unlawful interrogation, and the unlawful seizure of the evidence found on his person.**

/S/ TERRY N. TRIEWEILER

Justice William E. Hunt, Sr. joins in the foregoing dissent of Justice Terry N. Trieweiler.

/S/ WILLIAM E. HUNT, SR.