No. 05-318

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 263

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

ZANE BEN WRZESINSKI,

        Defendant and Appellant.


APPEAL FROM:    The District Court of the First Judicial District,
                   In and For the County of Lewis and Clark, Cause ADC 04-095,
                   Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Wendy Holton, Attorney at Law, Helena, Montana

        For Respondent:

        Honorable Mike McGrath, Attorney General; Tammy K. Plubell,
        Assistant Attorney General, Helena, Montana

        Michael T. Menahan, Deputy County Attorney, Helena, Montana


                   Submitted on Briefs:  May 10, 2006

                          Decided:  October 16, 2006

Filed:

_____
                      Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Zane Ben Wrzesinski (Wrzesinski) appeals from the judgment entered in the First Judicial District Court, Lewis and Clark County, finding him guilty of driving under the influence of alcohol (DUI), a felony, in violation of § 61-8-401, MCA (2003). Wrzesinski challenges the District Court's denial of his pretrial motions. We affirm.

¶2    We restate the issues on appeal as follows:

¶3    1. Did the District Court err in denying Wrzesinski's motion to dismiss by concluding that the State did not impede Wrzesinski from getting an independent blood test?

¶4    2. Did the District Court err in denying Wrzesinski's motion to suppress statements made during a routine traffic stop?

### FACTUAL AND PROCEDURAL BACKGROUND

¶5    On April 9, 2004, at approximately 11:30 p.m., Helena Police Department Officer Gary Herbst (Officer Herbst) was traveling east on Boulder Avenue in Helena, Montana, while on routine patrol. Officer Herbst observed a pickup truck fail to come to a complete stop at a stop sign, later estimating the pickup truck was traveling between fifteen and twenty miles per hour as it went through the intersection. Officer Herbst then initiated a traffic stop and approached the vehicle. Upon contact with Wrzesinski, Officer Herbst noticed the odor of alcohol and, further, that Wrzesinski's face was red and flushed, that he slurred his speech, and exhibited slow and deliberate movements. Officer Herbst asked for Wrzesinski's driver's license, registration, and insurance, but Wrzesinski had difficulty in complying with Officer Herbst's request, struggling to

2

remember what was asked of him and to find the requested items. Officer Herbst next asked Wrzesinski how much he had had to drink, and Wrzesinski responded that he had a couple of beers.

¶6 Officer Herbst then asked Wrzesinski to perform field sobriety tests. Wrzesinski initially declined and advised Officer Herbst that he was still able to drive his vehicle. Officer Herbst then asked Wrzesinski where he had been, and Wrzesinski responded he had just left Hap's bar and was previously at the Motherlode Casino. At this point, Wrzesinski admitted that he had consumed approximately eight beers in the last three to six hours. When Wrzesinski finally got out of his vehicle, he had trouble keeping his balance. Officer Herbst read Wrzesinski the preliminary alcohol screening test advisory and asked Wrzesinski to provide a preliminary breath sample. After asking if Officer Herbst's patrol car was equipped with a video camera, Wrzesinski declined to provide a preliminary breath sample. Wrzesinski performed poorly on the field sobriety tests, after which Officer Herbst gave Wrzesinski another opportunity to provide a preliminary breath sample. Wrzesinski again declined and Officer Herbst placed him under arrest.

¶7 At the jail, Officer Herbst read Wrzesinski the implied consent advisory form, which includes, in part, the following language:

> Under Montana law, a person in your situation is deemed to have given his or her implied consent to testing for alcohol and possibly testing for drugs. As the requesting officer, I have the right to select the type of test or tests you will be asked to take. I am going to ask you to take a breath (or blood) test. (Later I may ask you to take a blood test.)

When Officer Herbst read the parenthetical, "[l]ater I may ask you to take a blood test," he paused to inform Wrzesinski that he was not going to request a blood test because he

3

did not believe Wrzesinski was under the influence of drugs. The following dialogue then transpired:

Wrzesinski: So why wouldn't you ask me to take a blood test then?

Officer Herbst: Because we take a breath test is what we do.

Wrzesinski: I want a blood test though.

Officer Herbst: Hold on a second, okay? I'll explain that to you right now.

After this exchange, Officer Herbst read more of the implied consent advisory form to Wrzesinski, which goes on to state:

After the requested testing is completed or refused, you may have a doctor or nurse administer an independent test for alcohol or drugs at your expense. If you refuse testing now, taking an independent test will not change the action taken on your driver's license.

Wrzesinski refused to take the breath test. After Officer Herbst concluded the reading of the implied consent advisory, Wrzesinski did not request an independent blood test or otherwise raise the topic of alternatives to the breath test. Officer Herbst did give Wrzesinski one last opportunity to provide a breath sample, but Wrzesinski again refused and made no request for an independent blood test.

¶8 On May 4, 2004, the State filed an information charging Wrzesinski with DUI, in violation of § 61-8-401, MCA, to which Wrzesinski pled not guilty. Wrzesinski thereafter filed a motion to dismiss the DUI charge and a motion to suppress statements he made during the initial traffic stop with Officer Herbst. A hearing was held on Wrzesinski's two motions, whereupon the District Court entered findings of fact, conclusions of law, and an order denying both motions. The District Court conducted a

4

jury trial on March 7, 2005, and the jury found Wrzesinski guilty. The District Court sentenced Wrzesinski to the Department of Corrections for thirteen months for placement at the WATCH Program, followed by a three-year suspended sentence to the Department of Corrections. Wrzesinski appeals.

## STANDARD OF REVIEW

¶9     A district court's ruling on a motion to dismiss in a criminal case involves a question of law which we review *de novo*. *State v. Minkoff*, 2002 MT 29, ¶ 8, 308 Mont. 248, ¶ 8, 42 P.3d 223, ¶ 8. We review a district court's denial of a motion to suppress to determine whether its findings of fact are clearly erroneous and whether its application and interpretation of the law is correct. *State v. Copelton*, 2006 MT 182, ¶ 8, 333 Mont. 91, ¶ 8, 140 P.3d 1074, ¶ 8.

## DISCUSSION

¶10 *Did the District Court err in denying Wrzesinski's motion to dismiss by concluding that the State did not impede Wrzesinski from getting an independent blood test?*

¶11     Wrzesinski argues that the DUI charge must be dismissed because he requested a blood test and Officer Herbst did not honor that request. Wrzesinski further argues that Officer Herbst unreasonably impeded his right to obtain a blood test by failing to follow up on Wrzesinski's original request. Wrzesinski asserts that this denial of his right to obtain an independent blood test is a denial of due process and requires dismissal of the case pursuant to *State v. Swanson*, 222 Mont. 357, 360-61, 722 P.2d 1155, 1157 (1986). Wrzesinski's argument further rests upon *Minkoff*, where a police officer informed Minkoff that a blood alcohol concentration (BAC) result from a blood test would actually

5

be higher than the BAC result obtained from a breath test. There, this Court held that Minkoff's right to an independent blood test was frustrated by the officer's comments, requiring dismissal. *Minkoff*, ¶ 24.

¶12 Wrzesinski also urges the Court to apply the holding of the Court of Appeals of Georgia in *Ladow v. State*, 569 S.E.2d 572 (Ga. App. 2002). In *Ladow*, while a police officer was reading the Georgia Implied Consent Advisory to Ladow, Ladow interrupted to inform the officer that "I've already heard all that," and that "I want a blood test." The officer replied, "[h]old on, please," and then read the remainder of the advisory to Ladow. *Ladow*, 569 S.E.2d at 573. In Georgia, as in Montana, an accused has the right to an independent chemical test to determine his or her BAC, in addition to whatever test is administered by the state. The Court held that Ladow's statement "I want a blood test" should have been construed by the officer to include both the state-administered blood test *and* an independent blood test, especially in view of the fact that Ladow, by stating "I've already heard all that," had demonstrated her familiarity with the implied consent law. Because the officer only gave Ladow the state-administered blood test, the court reversed her conviction. *Ladow*, 569 S.E.2d at 575.

¶13 In response, the State argues that Wrzesinski did not reasonably articulate a request for an independent test, but instead requested that Officer Herbst designate a blood test, rather than a breath test, as the state-administered test. The State counters Wrzesinski's reliance on *Ladow* with the Georgia court's later decision in *State v. Gillaspy*, 605 S.E.2d 835 (Ga. App. 2004), which distinguished the holding in *Ladow*. In *Gillaspy*, the court held that Gillaspy's statement in response to the implied consent

6

advisory, "I will do a blood test," constituted Gillaspy's choice of which state-administered test to submit. The court determined there was no request for an independent test. *Gillaspy*, 605 S.E.2d at 837. The court distinguished *Ladow* by highlighting the difference between Ladow, who had expressed knowledge of the implied consent law, and Gillaspy, who had indicated no previous knowledge of the implied consent law. *Gillaspy*, 605 S.E.2d at 837-38. Thus, the Georgia court determined to interpret answers in accordance with the particular accused's knowledge: "if an accused already possesses that information and has requested an independent test, the giving of the warnings themselves cannot become the stumbling block to fulfilling the otherwise unambiguous request." *McGinn v. State*, 602 S.E.2d 209, 211 (Ga. App. 2004). For this reason, the State argues that, even under the reasoning expressed in the Georgia cases, because Wrzesinski did not articulate any familiarity with the implied consent law, his request, "I want a blood test though" can be construed as nothing more than a request to Officer Herbst to perform a state-administered blood test rather than a state-administered breath test.

¶14 Although the Georgia cases offered by the parties are factually similar, we conclude that we need not apply the approach embodied there. Requiring that an accused's comments be interpreted in light of the accused's particular familiarity with the law could well be problematic in practical application. More importantly, our precedent provides sufficient guidance on this issue to properly direct our decision herein.

¶15 The State offers *State v. Klinkhammer*, 256 Mont. 275, 846 P.2d 1008 (1993), as an example of this Court's appropriate interpretation of a DUI suspect's response as

7

requesting a particular type of state-administered test, rather than an independent test. In *Klinkhammer*, the accused misunderstood the implied consent law and requested a sobriety test from his physician. The officer informed Klinkhammer that he could obtain an independent test from his physician only after he accepted or refused the state-administered test. Klinkhammer chose to give a breath test. After the breath test, Klinkhammer did not request an independent test. *Klinkhammer*, 256 Mont. at 277, 846 P.2d at 1009-10. On appeal, Klinkhammer argued he was denied due process because he requested and was not allowed to obtain an independent test. This Court held Klinkhammer was not requesting an independent test under § 61-8-405(2), MCA, but was requesting his physician to perform the state-administered sobriety test, and that there was no violation of Klinkhammer's due process rights. *Klinkhammer*, 256 Mont. at 279, 846 P.2d at 1011. The State urges us to reach the same conclusion here.

¶16 Pursuant to § 61-8-402(1), MCA, any person operating or in actual physical control of a vehicle upon ways of the state is considered to have given consent to a test of the person's blood or breath for the presence of alcohol or drugs. The peace officer investigating or making an arrest for a DUI offense may designate which test is to be used to determine the person's BAC. Section 61-8-402(2)(b), MCA. Then, § 61-8-405(2), MCA, provides as follows regarding the right to obtain an independent test:

> In addition to any test administered at the direction of a peace officer, a person may request that an independent blood sample be drawn by a physician or registered nurse for the purpose of determining any measured amount or detected presence of alcohol, drugs, or any combination of alcohol and drugs in the person. The peace officer may not unreasonably impede the person's right to obtain an independent blood test. The officer may but has no duty to transport the person to a medical facility or

otherwise assist the person in obtaining the test. The cost of an independent blood test is the sole responsibility of the person requesting the test. The failure or inability to obtain an independent test by a person does not preclude the admissibility in evidence of any test given at the direction of a peace officer.

¶17 We have held that an accused has a constitutionally guaranteed due process right to attempt to obtain exculpatory evidence, which includes the right to obtain an independent test to determine the accused's BAC when charged with a DUI offense. *State v. Smerker*, 2006 MT 117, ¶ 16, 332 Mont. 221, ¶ 16, 136 P.3d 543, ¶ 16; *Minkoff*, ¶ 9; *State v. Sidmore*, 286 Mont. 218, 233, 951 P.2d 558, 568 (1997). A defendant who alleges a denial of due process with regard to the right to an independent BAC test must establish both that the defendant timely requested the independent test and that the arresting officer unreasonably impeded the right to the test. *Smerker*, ¶ 16; *Minkoff*, ¶ 10. Additionally, "we have held that the accused must be informed of his or her right to independent testing and that failure to so advise is a due process violation." *Smerker*, ¶ 16; *Minkoff*, ¶ 9.

¶18 After the briefs were submitted herein, we decided *Smerker*, concluding that the accused failed to establish that his right to an independent BAC test was unreasonably impeded and thus failed to establish a violation of his due process rights. *Smerker*, ¶ 21. In *Smerker*, a police officer read the implied consent advisory, and when reading the portion which informed Smerker that the officer was requesting him to take a breath test, Smerker interrupted and asked whether he could take a urine test. The officer responded by advising Smerker that his questions would be answered by listening to the remainder of the advisory. *Smerker*, ¶ 17. Following his insufficient breath test which the officer

marked as a refusal, Smerker inquired about the possibility of a urine test, to which the officer explained Smerker could obtain at his own expense but that the deemed refusal of the breath test would remain. *Smerker*, ¶ 18. On appeal, Smerker argued that the officer's failure to allow an independent urine test, which he had "clearly" requested, violated his due process rights by impeding his ability to obtain such a test. *Smerker*, ¶19. We held that the officer clearly informed Smerker of his right to obtain an independent BAC test, that the state-administered test in which Smerker was free to submit to or refuse would be a breath test, and that Smerker was welcome to obtain a urine test at his own expense. Thus, Smerker's ability to obtain an independent urine test had not been impeded "in any way" by the officer. *Smerker*, ¶ 20.

¶19 Officer Herbst had a short discussion with Wrzesinski as to what state-administered sobriety test would be requested of Wrzesinski. Wrzesinski then inquired why a blood test would not be performed, to which Officer Herbst explained that a breath test is the standard procedure. Wrzesinski's statements to Officer Herbst do not indicate that he wanted a blood test as a separate test, and after Officer Herbst finished reading the advisory portion addressing Wrzesinski's right to an independent test, Wrzesinski made no requests for an additional or independent test. Although the District Court did not make a specific finding in this regard, the evidence demonstrates that Wrzesinski's statements can reasonably be construed as an expression of Wrzesinski's desire to request a blood test as an alternative for the breath test that Officer Herbst had selected, which, as explained above, is the choice of the officer. Under these facts, we are hard pressed to construe Wrzesinski's statements as a request for an independent blood test.

10

¶20   The dissent relies upon *City of Whitefish v. Pinson*, 271 Mont. 170, 895 P.2d 610 (1995), which we conclude is factually distinguishable.  Pinson was read the implied consent advisory, and thereafter expressed confusion about the breath test which had been designated by the officer.  The officer then discussed both the designated and independent tests, "ma[king] it clear that an independent test would not be in lieu of the breath test he had designated."  *Pinson*, 271 Mont. at 173, 895 P.2d at 612.  At that point, Pinson stated "[l]et's do blood," to which the officer responded that he was "marking that down as a refusal" because Pinson would not agree to a breath test.  The officer then advised Pinson that "[w]e'll go get blood in a little while, but you realize it will be at your own expense" and Pinson replied "I don't care."  However, despite the officer's assurance of a blood test and Pinson's acknowledgement of the cost obligation, the blood test was not obtained.  *Pinson*, 271 Mont. at 173, 895 P.2d at 612.  Under these facts, we concluded that "the officer-designated test had been refused" but that an independent blood test had been "clearly stated and timely made."  *Pinson*, 271 Mont. at 174-75, 895 P.2d at 612-13.  The City's failure to honor Pinson's request required dismissal.  *Pinson*, 271 Mont. at 175, 895 P.2d at 613.

¶21   In contrast to *Pinson*, there was no clear discussion here about the two separate tests.  Wrzesinski stated "I want a blood test though," but did so during Officer Herbst's explanation of the officer-designated test.  He offered no comments or requests after Officer Herbst read the portion of the advisory which discussed an independent test.  Unlike the officer in *Pinson*, there is no indication that Officer Herbst understood that Wrzesinski was requesting an independent test, and, of course, Officer Herbst made no

11

comments regarding arrangements for such a test. Further, even if we could assume that Wrzesinki had "clearly stated and timely made" a request for an independent test, we would still need to conclude that Officer Herbst "unreasonably impeded" Wrzesinski's request in order for Wrzesinski to prevail, a question to which we now turn.

¶22 The District Court concluded that, "in any event," there was no evidence that the officer had impeded any request from Wrzesinski. As stated above, an accused who alleges a denial of due process with regard to the right to an independent BAC test must establish both that the defendant timely requested the independent test and that the arresting officer unreasonably impeded the right to the test. *Smerker*, ¶ 16; *Minkoff*, ¶ 10.

¶23 In evaluating the 'unreasonably impeding' element of this test, we have found that where police officers failed to properly store a defendant's blood sample, the defendant's right to an independent test was impeded and due process was denied. *Swanson*, 222 Mont. at 362, 722 P.2d at 1158. Further, where a defendant makes a timely request for an independent test and a police officer assures the defendant he or she will eventually receive the requested test, it is a violation of the defendant's due process right to then not permit the test to occur. *Pinson*, 271 Mont. at 175, 895 P.2d at 613. More recently, the Court has held that where a police officer discourages a defendant from getting an independent sobriety test by advising the defendant that the result from the independent test may be higher than the result from the state-administered test, the police officer has unreasonably impeded the defendant's right to an independent sobriety test and has thus violated the defendant's due process rights. *Minkoff*, ¶ 24.

¶24 Wrezesinski argues that he was given no opportunity to obtain an independent blood test and thus, his right to obtain one was unreasonably impeded. From his argument, it seems that Wrzesinski seeks to impose a duty upon Officer Herbst to attempt clarification of Wrzesinski's statements about the blood test. Further, Wrzesinski argues that Officer Herbst never assured him that his request for a blood test would be accommodated. Ultimately, these arguments are efforts to prevail on the ultimate issue, that is, whether Officer Herbst unreasonably impeded Wrzesinski's ability to obtain an independent blood test.

¶25 There is no question that Officer Herbst read the implied consent law to Wrzesinski, including that "[i]n addition to any test administered at the direction of a peace officer, a person may request that an independent blood sample be drawn . . . ." Officer Herbst's comment to Wrzesinski to wait until they were finished with reading the advisory and obtaining his decision on taking the breath test before addressing further testing, without more, does not rise to an unreasonable impediment of Wrzesinski's ability to obtain an independent blood test. Wrzesinski had the opportunity to request an independent test following completion of the reading of the advisory, and he failed to do so. Furthermore, Officer Herbst's silence regarding the issue of an independent blood test after Wrzesinski had refused the breath test did not unreasonably impede Wrzesinski, then properly advised, from obtaining an independent blood test. Although it would have been permissible courtesy for Officer Herbst to make further inquiry of Wrzesinski about the blood test, he was under no legal duty to inform Wrzesinski of anything other than

13

what was in the implied consent law. Officer Herbst fulfilled the obligations of § 61-8-402, MCA and § 61-8-405(2), MCA.

¶26 We conclude that Wrzesinski did not request an independent blood test, and assuming, arguendo, that Wrzesinski had done so, Officer Herbst did not unreasonably impede Wrzesinski from obtaining the independent blood test.

¶27 ***Did the District Court err in denying Wrzesinski's motion to suppress statements made during a routine traffic stop?***

¶28 Wrzesinski argues that the District Court erred by not suppressing statements he made to Officer Herbst during the roadside DUI investigation. Specifically, Wrzesinski asserts that the statements made between the time Officer Herbst asked Wrzesinski to get out of the vehicle and when Wrzesinski was arrested should be suppressed because Officer Herbst did not give Wrzesinski a *Miranda* warning.

¶29 The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself . . . ." In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), the United States Supreme Court addressed the issue of protecting a suspect's right against compelled self-incrimination in the context of a custodial interrogation. The Court held that the prosecution may not use statements stemming from a custodial interrogation unless the defendant is advised prior to questioning of the right to remain silent, that any statement may be used as evidence against the defendant, and that the defendant has a right to the presence of an attorney. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. By custodial interrogation, the Court meant "questioning initiated by law enforcement officers after a

14

person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. *Miranda* continues to constrain the admission of statements in state court proceedings made by a suspect during custodial interrogation and not preceded by sufficient warnings. *See, e.g., Berkemer v. McCarty*, 468 U.S. 420, 428, 104 S.Ct. 3138, 3144 (1983).

¶30  Wrzesinski is entitled to the protections of *Miranda* only if he was subject to "custodial interrogation." *State v. Elison*, 2000 MT 288, ¶ 27, 302 Mont. 228, ¶ 27, 14 P.3d 456, ¶ 27; *State v. Dawson*, 1999 MT 171, ¶ 30, 295 Mont. 212, ¶ 30, 983 P.2d 916, ¶ 30. A person is "in custody" for the purposes of *Miranda* if they have been deprived of their freedom of action in a significant way or their freedom of action has been curtailed to a degree associated with a formal arrest. *Elison*, ¶ 27; *Dawson*, ¶ 30.

¶31  In *Elison*, a police officer initiated a traffic stop of Elison after the officer's passenger, a ride-along citizen, noticed Elison in his vehicle smoking what appeared to be a marijuana pipe. *Elison*, ¶ 6. The officer went through the traffic stop and observed signs that Elison was indeed smoking marijuana. After informing Elison of why he made the stop, the officer asked him what he did with the marijuana pipe. Elison responded that he threw it out the window and made further admissions during the traffic stop. *Elison*, ¶¶ 8-10. Elison argued on appeal that his statements should have been suppressed because he was not free to leave and thus, should have been given a *Miranda* warning. *Elison*, ¶ 25. We disagreed with Elison, finding that he was merely subjected to "the normal restraints that any motorist might expect to be subject to during a routine *Terry*

15

stop." *Elison*, ¶ 33.  Due to the non-custodial nature of the stop, Elison was not entitled to *Miranda* warnings and his statements were admissible.  *Elison*, ¶ 34.

¶32    *Elison* re-affirmed the holding of *State v. Allen*, 1998 MT 293, 292 Mont. 1, 970 P.2d 81, on facts similar to those here.  In *Allen*, a police officer initiated a traffic stop because Allen's vehicle did not have a front license plate.  The officer decided to cite Allen for a license plate infraction.  *Allen*, ¶¶ 4-5.  While explaining the citation to Allen, the officer noticed the odor of alcohol coming from Allen and asked Allen if he had been drinking.  Allen admitted consuming alcohol and was eventually arrested for DUI.  *Allen*, ¶ 6.  Allen moved to suppress his admission that he had consumed alcohol on the grounds that he was in custody and the police officer had not given him a *Miranda* warning. *Allen*, ¶ 7.  We determined the traffic stop was not custodial because it was "public, routine, and temporary in nature," and did not require a Miranda warning.  *Allen*, ¶ 13.

¶33    Wrzesinski argues that the Court's holding on this issue in *Elison* was "implicitly overruled" by *State v. Olson*, 2003 MT 61, 314 Mont. 402, 66 P.3d 297.  In *Olson*, police officers investigated information about a possible methamphetamine laboratory that was suspected to be in Olson's vehicle.  *Olson*, ¶¶ 6-7.  A police officer stopped Olson's vehicle, removed her from it, and informed her that he knew a methamphetamine laboratory was in the trunk of the vehicle.  Olson eventually admitted that the methamphetamine laboratory was indeed in the trunk.  *Olson*, ¶¶ 8-9.  Olson moved to suppress the statements made to police officers arguing that she was in custody at the time the questioning occurred and was not given a *Miranda* warning.  *Olson*, ¶ 14.  This Court determined that Olson was in custody at the time of questioning because two of

16

Olson's passengers had been removed and handcuffed, there were numerous police officers at the scene, Olson was never standing alone, and Olson was never free to leave. *Olson*, ¶¶ 19-20.

¶34 Importantly, *Olson* did not involve a routine traffic stop, but an investigation regarding a methamphetamine laboratory. Olson was taken out of her vehicle while her passengers were handcuffed, she was clearly not free to leave, and was subjected to additional questioning. Here, the facts are consistent with *Elison* and *Allen*. As in *Allen*, Wrzesinski was the subject of a traffic stop. The contact with Officer Herbst came in public and the stop was temporary in nature. Although Wrzesinski was not free to leave, the facts demonstrate he was subjected to the routine process surrounding a traffic stop, noncustodial in nature, until he was placed under arrest. Nothing in *Olson* would change our holdings in *Allen* and *Ellison* that a public, routine, and temporary traffic stop does not rise to the level of placing one in custody, and does not require *Miranda* warnings. *Allen*, ¶ 13; *Elison*, ¶ 33.

## CONCLUSION

¶35 The judgment of the District Court is affirmed.

/S/ JIM RICE

We concur:

/S/ PATRICIA COTTER

/S/ JOHN WARNER
/S/ BRIAN MORRIS

Justice James C. Nelson dissents.

¶36    I dissent from the Court's analysis and resolution of Issue One and therefore would not address Issue Two.

¶37    The dialogue between Wrzesinski and Officer Herbst is set forth at ¶ 7 of the Court's Opinion. As the record reflects, the dialogue is as follows:

| | |
|---|---|
| Wrzesinski: | So why wouldn't you ask me to take a blood test then? |
| Officer Herbst: | Because we take a breath test is what we do. |
| Wrzesinski: | I want a blood test though. |
| Officer Herbst: | Hold on a second, okay? I'll explain that to you right now. |

¶38    From this dialogue and Wrzesinski's clear and unequivocal statement: "I want a blood test though," the Court concludes at ¶ 19 that "Wrzesinski made no requests for an additional or independent test." Conceding that the District Court did not make any particular finding in this regard, the Court then goes on to infer that Wrzesinski did not want an independent blood test, but rather, was requesting an alternative to the breath test that Officer Herbst had selected. The Court states that it is "hard pressed to construe Wrzesinski's statements as a request for an independent blood test." The Court's construction of Wrzesinski's statements not only ignores the clear and unambiguous language which Wrzesinski used: "I want a blood test though," but also ignores our case law which is on point.

¶39    First, if it is necessary to construe Wrzesinski's language at all, it must be construed in precisely the opposite fashion as does the Court. A review of the videotape of the booking

18

process at the jail indicates that when Officer Herbst requested that Wrzesinski take a breath test, Wrzesinski firmly responded: "I want a blood test *though*," (emphasis supplied). Clearly from the language which he used and the tone of his voice, Wrzesinski was not suggesting an alternative to the breath test, but he was informing Officer Herbst that he, additionally, wanted an independent blood test. "Though" means "however" or "nevertheless." *Merriam-Webster's Collegiate Dictionary* 1228 (10th ed., Merriam-Webster 1997). Wrzesinski wanted a blood test "nevertheless."

¶40 Second, we faced this same situation in *City of Whitefish v. Pinson*, 271 Mont. 170, 895 P.2d 610 (1995). Pinson appealed from her conviction of violating § 61-8-401, MCA. We reversed, holding that the District Court erred in denying Pinson's motion to dismiss the charge. The specific issue which we addressed was whether Pinson's due process rights were violated by the failure of the City of Whitefish (the City) to comply with a request for an independent blood test. *Pinson*, 271 Mont. at 171, 895 P.2d at 611.

¶41 Pinson alleged that she had requested an independent blood test during the booking procedure. The City stated that Pinson had not made a timely request for a blood test and the District Court agreed, denying Pinson's motion to dismiss pursuant to *State v. Peterson*, 227 Mont. 418, 739 P.2d 958 (1987) and *State v. Klinkhammer*, 256 Mont. 275, 846 P.2d 1008 (1993). *Pinson*, 271 Mont. at 172, 895 P.2d at 612-13. Examining the record, we noted that, not unlike Wrzesinski in the case at bar, Pinson was initially somewhat confused during the booking procedure regarding the breath test designated by the officer and whether she wanted to submit to that test. The officer explained to Pinson several times the breath test requirements and made it clear that an independent test would not be in lieu of the breath test he had designated. Pinson stated "Let's do blood." Thereafter the officer advised that he was "marking that down as a

refusal," and Pinson responded that she did not know what to do. The officer then stated: "We'll go get blood in a little while, but you realize it will be at your own expense." Pinson replied, "I don't care." No further discussion regarding either the breath test or the blood test was available and the booking procedure was completed and Pinson was placed in a cell. *Pinson*, 271 Mont. at 173, 895 P.2d at 612.

¶42 Based upon this dialogue, which is not markedly different than the dialog between Wrzesinski and Officer Herbst, we concluded that Pinson's request for a blood test was clearly stated and timely made. We also concluded that the officer affirmatively told Pinson that they would get the requested blood test. *Pinson*, 271 Mont. 15 173, 895 P.2d at 612.

¶43 On this record, we concluded that the City's characterization of Pinson's clear and timely request was inappropriate. Moreover, we concluded that the District Court's implicit finding that Pinson did not timely request an independent blood test was not supported by substantial credible evidence and was clearly erroneous. *Pinson*, 271 Mont. at 174, 895 P.2d at 613.

¶44 The only real difference between the dialogue in *Pinson* and in the instant case is that in the former, the officer stated that he would assist Pinson in obtaining the independent test, whereas Officer Herbst did not do so in the present case. That difference notwithstanding, each defendant's timely and unequivocal request for an independent test was substantially the same: Pinson stated, "Let's do blood," *Pinson*, 271 Mont at 173, 895 P.2d at 612; Wrzesinski stated, "I want a blood test though."

¶45 Moreover, even in the case at bar, the trial court speculated that "[t]he officer may have simply forgotten to ask [Wrzesinski], or he might have believed that [Wrzesinski] simply changed his mind after being reminded [as was Pinson] that the blood test would be at his own expense."

¶46    I would rule consistently with *Pinson* and hold that Wrzesinski timely and unequivocally requested an independent blood test.  Because Wrzesinski was precluded from obtaining the independent blood test, I would, as did the Court in *Pinson*, reverse and remand with instructions to the District Court to dismiss the charge.  *Pinson*, 271 Mont. at 175, 895 P.2d at 613.

¶47    I dissent.

/S/ JAMES C. NELSON