No. 02-268

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 61

STATE OF MONTANA,

       Plaintiff and Respondent,

   v.

SHARON MARIE OLSON,

       Defendant and Appellant.

APPEAL FROM:     District Court of the Eighth Judicial District,
                      In and for the County of Cascade, Cause No. BDC 2001-117-4,
                      The Honorable Julie Macek, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

            Eric Olson, Chief Public Defender, Great Falls, Montana

            Kelli Sather, Deputy Public Defender, Missoula, Montana

       For Respondent:

            Hon. Mike McGrath, Attorney General;
            Ilka Becker, Assistant Attorney General, Helena, Montana

            Brant Light, Cascade County Attorney, Great Falls, Montana

                      Submitted on Briefs:  October 3, 2002

                                Decided:  March 27, 2003

Filed:

_____
                     Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1     The Appellant, Sharon Marie Olson, was charged by information filed in the District Court for the Eighth Judicial District in Cascade County, with criminal endangerment, in violation of § 45-5-207, MCA (1999), and accountability for criminal production or manufacture of dangerous drugs, in violation of § 45-2-302(3), MCA (1999) and § 45-9-110, MCA (1999).  She moved to suppress evidence gathered by the State.  When the District Court denied Olson's motion, she pled guilty to an amended charge of criminal possession of dangerous drugs.  However, she appeals from the District Court's denial of her motion to suppress.  We reverse in part and affirm in part the District Court's order.  We affirm the judgment of the District Court.

¶2     We restate the issues on appeal as follows:

¶3     1.  Did the District Court err when it denied Olson's motion to suppress the statements she made to Detective Wells?

¶4     2.  Was the search warrant application supported by probable cause?

¶5     3.  Did a particularized suspicion exist to justify an investigative traffic stop of Olson's vehicle?

## FACTUAL BACKGROUND

¶6     On March 16, 2001, Detective Jeff Beecroft received a report from informant Mike Smith regarding a possible methamphetamine laboratory on his wife's property in Great Falls, Montana.  Mike stated that he and his wife, Nora Smith, were separated, and then provided Beecroft with Nora's address.  Mike advised Beecroft that he had entered Nora's

garage to retrieve two camper jacks. Mike further advised Beecroft that while in the garage, he had observed what he believed to be a meth lab. Mike indicated that he had observed tubing, mason jars, and coffee filters connected together, and had smelled the odor of anhydrous ammonia. He informed Beecroft that he had worked in a fertilizer plant for several years and was familiar with the smell of anhydrous ammonia. Mike also told Beecroft that he had observed a man "cooking" methamphetamine in the garage and identified the man as Huston Curran. Finally, he informed Beecroft that he had spoken briefly with Curran, who had stated, "you're going to keep this cool, now, right?"

¶7 Detective Beecroft dispatched Detectives Jim Wells and Michael Grubb to conduct surveillance of Nora's property. Within an hour after Wells and Grubb began surveillance, individuals on Nora's property began to remove items from the garage and place them into a vehicle. The vehicle then left Nora's property. At the request of Wells and Grubb, Sergeant Tito Rodriguez initiated an investigative traffic stop of the vehicle. At the time of the stop, Olson was driving the vehicle and her young son was in the passenger seat. Curran and a man identified as Justin Becker were in the rear seat.

¶8 The vehicle stopped by Sergeant Rodriguez was registered to Olson. After Olson was removed from the vehicle, Detective Wells approached her and advised her of his investigation. Wells informed Olson that he knew a meth lab had been placed in the trunk of her vehicle. Olson initially denied Wells' allegations. However, after Wells spoke to her about the health risks of a meth lab, Olson admitted that the equipment was located in her vehicle. A warrant was subsequently issued, and the search of Olson's trunk revealed

3

chemicals, glassware, funnels, tubing, methamphetamine, and other "precursors" used to manufacture methamphetamine, including red pills labeled Sudafed.

¶9     On March 29, 2001, the Respondent, State of Montana, filed an information, which charged Olson with criminal endangerment, a felony, in violation of § 45-5-207, MCA (1999), and accountability for criminal production or manufacture of dangerous drugs, a felony, in violation of § 45-2-302(3), MCA (1999) and § 45-9-110, MCA (1999).  Olson pled not guilty to both charges on April 12, 2001.  On June 22, 2001, Olson filed a motion to suppress evidence, in which she claimed that: (1) the search warrant application did not adequately establish the reliability and credibility of the informant whose statements provided the basis for the warrant request; (2)  the search warrant application was legally invalid because it included inaccurate and misleading information; (3) the search warrant application did not establish probable cause; (4) the initial traffic stop was not supported by a particularized suspicion; (5) her statements were obtained in violation of her constitutional rights; and (6) evidence seized as a result of the search of her vehicle must be suppressed.

¶10    The District Court conducted hearings on Olson's motion to suppress on October 24, and October 29, 2001.  On November 13, 2001, the State filed an amended information, which charged Olson with the additional offense of criminal possession of precursors to dangerous drugs, a felony, in violation of § 45-9-107(1)(n), MCA (1999).  The District Court denied Olson's motion to suppress that same day.  On November 15, 2001, Olson pled guilty to an amended charge of criminal possession of dangerous drugs, a felony, in violation of § 45-9-102, MCA (1999).  The terms of Olson's plea agreement preserved her right to appeal

4

from the District Court's denial of her motion to suppress. The remaining charges against Olson were dismissed. Olson was sentenced by the District Court on January 30, 2002.

**STANDARD OF REVIEW**

¶11 The standard of review of a district court's denial of a motion to suppress is whether the court's findings of fact are clearly erroneous, and whether those findings were correctly applied as a matter of law. *State v. Dawson*, 1999 MT 171, ¶ 13, 295 Mont. 212, ¶ 13, 983 P.2d 916, ¶ 13.

**DISCUSSION**

**ISSUE 1**

¶12 Did the District Court err when it denied Olson's motion to suppress the statements she made to Detective Wells?

¶13 The Fifth Amendment to the United States Constitution and Article II, Section 25, of the Montana Constitution provide that no person shall be compelled, in any criminal case, to be a witness against himself. The United States Supreme Court addressed this privilege against self-incrimination in *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694. The *Miranda* Court held that the prosecution may not use statements that stem from a custodial interrogation of a defendant unless the defendant is warned, prior to questioning, that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. These "warnings" are often referred to as *Miranda* warnings.

5

¶14 In this case, Olson alleges that the statements she made to Detective Wells were obtained in violation of her Fifth Amendment and state constitutional rights because she did not receive *Miranda* warnings before she made the statements. A person is entitled to receive *Miranda* warnings only if he or she is subject to a custodial interrogation. *State v. Elison*, 2000 MT 288, ¶ 27, 302 Mont. 228, ¶ 27, 14 P.3d 456, ¶ 27. This Court has previously concluded that a custodial interrogation occurs when "there is a significant restriction of personal liberty similar to an arrest." *Dawson*, ¶ 35.

¶15 Olson was not under arrest at the time she conversed with Detective Wells. We have repeatedly held that law enforcement officers do not need to administer *Miranda* warnings to suspects during brief investigative encounters, even if such encounters are somewhat coercive. *Dawson*, ¶ 35. However, we have also concluded that if a person has no free right to leave, then the interrogation is custodial. *State v. Staat* (1991), 251 Mont. 1, 6, 822 P.2d 643, 646. To determine whether or not a custodial interrogation has occurred, this Court examines the following six factors: (1) place of the interrogation; (2) time of the interrogation; (3) persons present during the interrogation; (4) whether *Miranda* warnings were gratuitously given; (5) the length and mood of the interrogation; and (6) whether or not the suspect was arrested following the interrogation. *Staat*, 251 Mont. at 6, 822 P.2d at 646.

¶16 In this case, Detective Wells conversed with Olson after she had been removed from her vehicle. Prior to their conversation, Curran and Becker had been removed from Olson's vehicle and placed in handcuffs. Wells testified that at the time he approached Olson, "there [were] officers everywhere," and that he did not "believe [that Olson] was ever standing

6

alone." Wells further testified that he denied Olson's request to see her son. Finally, Wells testified that although Olson was not restrained or placed under arrest until after she admitted the meth lab was in her vehicle, Olson was not free to leave during their conversation.

¶17 The District Court found that at the time Olson conversed with Detective Wells her liberty was restricted in a manner similar to an arrest. Consequently, the District Court concluded that Olson's conversation with Detective Wells was custodial in nature. We agree. However, the District Court also determined that although Olson was in custody, she was not interrogated by Wells. With that finding, we disagree.

¶18 Interrogation has previously been defined by this Court as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *State v. Belgarde*, 1998 MT 152, ¶ 26, 289 Mont. 287, ¶ 26, 962 P.2d 571, ¶ 26. Here, the District Court concluded that because Detective Wells did not ask Olson any direct questions, Olson had not been interrogated by Wells. However, we have also noted that "interrogation" in the context of the Fifth Amendment and Article II, Section 25, of the Montana Constitution, refers not only to express questioning, but also to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *State v. Flack* (1993), 260 Mont. 181, 186, 860 P.2d 89, 92, see also *Rhode Island v. Innis* (1980), 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297. We have further noted that to determine whether an incriminating response was reasonably likely to be elicited from the suspect, the primary focus of the

7

analysis should be on the perceptions of the suspect, rather than on the intent of the police. *Flack*, 260 Mont. at 186, 806 P.2d at 92.

¶19 In this case, Detective Wells testified that when he initiated his conversation with Olson, his goal was to get her away from Curran and Becker. Wells further testified that he told Olson he knew she had a meth lab in her vehicle, and that he had watched the meth lab being loaded into her vehicle. Wells also testified that he spoke to Olson in some detail about the dangers of a meth lab. Finally, Wells testified that he told Olson that he was concerned for her safety, and for the safety of her son.

¶20 The statements made by Detective Wells were directed specifically at Olson. No other party was privy to their conversation, and Wells testified that Olson was not free to leave. We conclude that, under the circumstances, Wells should have known that his statements were reasonably likely to elicit an incriminating response from Olson. Therefore, we hold that Wells' statements to Olson constituted an interrogation for purposes of the Fifth Amendment and Article II, Section 25, of the Montana Constitution. Accordingly, because Olson did not receive *Miranda* warnings before she was interrogated by Wells, the statements she made to Wells were obtained in violation of her Fifth Amendment right against self-incrimination, and must be suppressed.

¶21 The District Court erred when it denied Olson's motion to suppress the statements she made to Detective Wells. This Court has excised Olson's statements from the search warrant application, and we now review the search warrant application without that information to determine whether it established probable cause.

**ISSUE 2**

¶22     Was the search warrant application supported by probable cause?

¶23     Detective Beecroft obtained a warrant to search both Nora's garage and Olson's vehicle. Olson contends that the search warrant application was not supported by probable cause. Specifically, Olson asserts that Mike Smith was not a reliable and credible informant.

¶24     An application for a search warrant must state facts sufficient to show probable cause for the issuance of a warrant. *State v. Grams*, 2002 MT 188, ¶ 14, 311 Mont. 102, ¶ 14, 53 P.3d 897, ¶ 14. To determine if probable cause to issue a warrant exists, this Court applies the totality of the circumstances test set forth in *Illinois v. Gates* (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed. 2d 527. Pursuant to this test, "the judge evaluates the facts asserted within the four corners of the [search warrant] application and makes a practical, common-sense decision as to whether there is a fair probability that incriminating items will be found in the place to which entry is sought." *Grams*, ¶ 14.

¶25     In this case, the search warrant application was based largely on the report of informant Mike Smith. This Court adopted a test for determining whether information provided by an informant is sufficient to establish probable cause in *State v. Reesman*, 2000 MT 243, ¶ 27, 301 Mont. 408, ¶ 27, 10 P.3d 83, ¶ 27. The *Reesman* test is based on three considerations. First, this Court must ascertain whether or not the informant was anonymous. *Reesman*, ¶ 28. Here, Olson concedes that Mike was not an anonymous informant. Therefore, we proceed to the second question.

9

¶26 If an informant is not anonymous, we next determine whether the information provided by the informant was based on his or her own personal observation of the criminal activity. *Reesman*, ¶ 29. In this case, Olson concedes that the information provided by Mike was based on his personal observation of the garage on Nora Smith's property. Therefore, we proceed to the third consideration.

¶27 The final part of the *Reesman* test requires this Court to ascertain whether the informant is a reliable source of information. *Reesman*, ¶ 31. In order for an informant to be reliable, he or she must either: (1) be a confidential informant who has provided reliable and accurate information in the past; (2) make an admission against his or her own interest; or (3) be a concerned citizen, motivated by "good citizenship." *Reesman*, ¶¶ 32-34. In this case, the District Court found that Mike was motivated by "good citizenship," because he immediately reported what he had witnessed. That is, the District Court found that even if Mike's motives were mixed, it is undisputed that he went immediately to the police department after he observed Nora's garage. Consequently, the District Court concluded that Mike was a reliable informant. The District Court further noted that a citizen informant is presumed to be reliable, and such reliability "is generally shown by the very nature of the circumstances under which the incriminating information became known." *Reesman*, ¶ 34 (quoting *State v. Valley* (1992), 252 Mont. 489, 493, 830 P.2d 1255, 1258). Here, Mike informed Detective Beecroft that he entered Nora's garage to retrieve two camper jacks. Mike also advised Beecroft that, while in Nora's garage, he observed what he believed to be a meth lab. He reported what he saw immediately. While there is evidence that Mike and

10

Nora had a strained relationship, that fact, by itself, is not sufficient to overcome the presumption that he acted as a good citizen. Accordingly, we hold that the District Court did not err when it concluded that Mike was a reliable informant.

¶28 In addition to Mike's report, the search warrant application also contained the observations of Detectives Wells and Grubb, who conducted surveillance of Nora's property. The application stated that: "Within an hour after Detective Wells arrived with Detective Mike Grubb, a man and a woman began transporting numerous garbage bags full of items to a white 1989 Ford Taurus. These two individuals then left the scene in the Ford Taurus." Although this behavior is not, by itself, illegal, when combined with other information in the search warrant application, it becomes significant. That is, only hours after Mike reported that: (1) he had observed a meth lab in Nora's garage; and (2) Curran was aware that he had made this observation; individuals began to move items from Nora's garage into a vehicle.

¶29 We conclude that the above combination of facts provided the Detectives with sufficient probable cause to believe that a meth lab was relocated from Nora's garage to Olson's vehicle. We further conclude that, under the totality of the circumstances, the search warrant application contained sufficient probable cause to support the issuance of a search warrant.

## ISSUE 3

¶30 Did a particularized suspicion exist to justify the investigative traffic stop of Olson's vehicle?

¶31 Olson maintains that the investigative traffic stop of her vehicle was not supported by a particularized suspicion on the part of law enforcement. Section 46-5-401, MCA (1999), addresses investigative stops. Section 46-5-401, MCA (1999), provides:

> In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

¶32 This Court applies a two-part test to determine whether a law enforcement officer had the requisite particularized suspicion to justify an investigative stop. *Grindeland v. State*, 2001 MT 196, ¶ 10, 306 Mont. 262, ¶ 10, 32 P.3d 767, ¶ 10. First, the State is required to show objective data from which an experienced officer could make certain inferences. Second, the State must show a resulting suspicion that the occupant of the vehicle in question is, or has been, engaged in wrongdoing. *Grindeland*, ¶ 10.

¶33 Olson cites *State v. Broken Rope* (1996), 278 Mont. 427, 925 P.2d 1157, in support of her contention that the officers lacked a particularized suspicion to perform an investigative stop of her vehicle. The defendant in *Broken Rope* visited a convenience store with a companion. An officer in the area ran a registration check on their vehicle and learned that a warrant had been issued for the arrest of the defendant's companion. The officer then waited for the two men to exit the convenience store. *Broken Rope*, 278 Mont. at 428-29, 925 P.2d at 1157-58. However, when the men exited the store they noticed the officer, and began to stare at him. The men also moved around the store's parking lot, put their hands in their pockets, and used the telephone. The officer determined that the men did

not intend to get into their vehicle while he was in the area, so he requested assistance. The two officers then initiated an investigative stop of the two men. *Broken Rope*, 278 Mont. at 429, 925 P.2d at 1158.

¶34 The District Court in *Broken Rope* found that the officers possessed a particularized suspicion to justify their investigative stop of the defendant. This Court, however, reversed the District Court, noting that "there is nothing inherently suspicious about [the defendant] using a pay telephone, moving around in a convenience store parking lot, putting his hands in his pockets or staring at a sheriff's deputy." *Broken Rope*, 278 Mont. at 432, 925 P.2d at 1160. We further noted that "many law-abiding citizens may well be nervous when their activities are being watched by law enforcement officers." *Broken Rope*, 278 Mont. at 432, 925 P.2d at 1160. Therefore, we concluded that the defendant's actions did not create a particularized suspicion that the defendant was, or had been, engaged in criminal activity. *Broken Rope*, 278 Mont. at 432, 925 P.2d at 1160.

¶35 Olson alleges that the facts of this case are similar to those in *Broken Rope* because, like the officer in *Broken Rope*, Detectives Wells and Grubb did not observe individuals engaged in criminal activity. *Broken Rope*, however, is distinguishable from the instant case. In *Broken Rope*, the officer's observation of the defendant in the parking lot was the *sole basis* for the investigative stop. In this case, Wells and Grubb did not merely observe individuals place items from Nora's garage into the trunk of a vehicle and drive away. Wells and Grubb were aware of the information contained in Mike's report at the time they performed the investigative stop of Olson's vehicle. The existence of particularized

suspicion is a question of fact determined by examining the totality of the circumstances surrounding the investigative stop. *Grindeland*, ¶ 10. Therefore, while the behavior observed by Wells and Grubb did not, by itself, raise a particularized suspicion of criminal activity, that behavior may have given rise to a particularized suspicion when combined with Mike's report that he observed a meth lab in Nora's garage that same day.

¶36 This Court has repeatedly held that particularized suspicion is a less stringent standard than probable cause. See *State v. Van Kirk*, 2001 MT 184, ¶ 14, 306 Mont. 215, ¶ 14, 32 P.3d 735, ¶ 14, and *State v. Williamson*, 1998 MT 199, ¶ 12, 290 Mont. 321, ¶ 12, 965 P.2d 231, ¶ 12. Accordingly, we conclude that because probable cause existed to search Olson's vehicle, it is axiomatic that a particularized suspicion existed to stop that same vehicle. Therefore, we hold that a particularized suspicion existed to justify the investigative traffic stop of Olson's vehicle.

¶37 For the foregoing reasons, we reverse that part of the District Court's order which held that Olson had not been interrogated in violation of her Fifth Amendment rights. However, after deleting her admission from the search warrant application, we conclude that probable cause existed to issue the search warrant for Olson's vehicle. Therefore, the judgment of the District Court is affirmed.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

14

/S/ PATRICIA COTTER

Justice Jim Rice concurring in part and dissenting in part.

¶38     I concur with the Court's resolution of Issues 2 and 3, and with the holding in this matter.  However, I find that the District Court correctly concluded that Olson, though in custody, was not questioned by Officer Wells, and was not subjected to interrogation. Therefore, I would affirm the District Court's denial of Olson's motion to suppress her statement, and dissent from the Court's contrary conclusion in Issue 1.

/S/ JIM RICE