FILED

May 26 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 13-0175

DA 13-0175

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 147

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JEREMY JOHN BRAULICK,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Sixth Judicial District,
In and For the County of Park, Cause No. DC 12-1
Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Wade Zolynski, Chief Appellate Defender, Jacob Q. Johnson, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, C. Mark Fowler, Assistant
Attorney General, Helena, Montana

          Bruce Becker, Park County Attorney, Livingston, Montana

Submitted on Briefs:  March 11, 2015
Decided:  May 26, 2015

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    Jeremy John Braulick appeals from his conviction of two counts of attempted deliberate homicide in the Sixth Judicial District Court, Park County. We affirm.

¶2    Braulick presents the following issues for review:

1. *Whether the District Court erred when it denied Braulick's motion to suppress spontaneous statements made after he was in custody, after he requested an attorney, and before he was notified of his Miranda rights.*

2. *Whether the District Court erred when it denied Braulick's motion to exclude one of the victims of the crime from the courtroom.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3    On the evening of December 27, 2011, Braulick was sitting at the kitchen table in his mother's house in Livingston, eating burritos with his mother, Cheryl Kautzman, and his step-father, Scott Kautzman. Braulick, who was 39 years old at the time, was staying with the Kautzmans during the holidays. Braulick was between residences and had been staying with friends when he called Cheryl and asked to stay at the house for Christmas. Cheryl was initially reluctant, because there had been some "disruptive behavior" and "bad language" in the past. Scott told Braulick that he would be allowed to stay only if he agreed not to "blow up" and not to be abusive toward his mother. Scott and Braulick agreed that if those conditions were violated, Braulick would have to leave. Cheryl gave Braulick a key to the house.

¶4    The Kautzmans kept a small television on the kitchen counter so they could watch the evening news. As they were eating dinner that night, they saw a commercial depicting the widow of a highway patrol officer who had been killed in a collision with a

2

drunk driver. Braulick said it was unfair that the public was so sympathetic to police officers, while people whose lives were, as he perceived, ruined by the police received nothing. Cheryl explained to Braulick that the commercial was against drunk driving, and not necessarily in support of law enforcement. Scott told Braulick he thought law enforcement officers did a very difficult job and deserved support. As Braulick became more agitated, both Cheryl and Scott reminded him of their agreement that he would have to leave if his behavior or language became aggressive. Braulick said he would leave, but on his own time. He walked out of the kitchen, and Cheryl followed, asking him to return the house key. Braulick refused, and Cheryl went out to the back porch to have a cigarette. Scott joined her.

¶5 A few minutes later, Braulick, who is six feet, five inches tall and weighed about 215 pounds at the time, rushed on to the porch and tackled Cheryl and Scott. Cheryl's head hit the floor and Scott said it looked like she had been knocked out. Braulick continued attacking Scott and trying to push him down the stairs to the basement. Scott clung to the bannister and "wouldn't go over." Scott recalled, "the next thing you know, I was in the corner of the wall and the door that goes outside kind of sitting on my legs, and I couldn't move. I don't know if he hit me behind the back of the head, or what, but I just couldn't move any part of my body." Scott fell to the floor two to three feet away from Cheryl. Braulick then kneeled on the floor and began choking Cheryl with his right hand and Scott with his left. When he stopped choking them, he hit Scott on the head several times. Cheryl attempted to crawl back to the kitchen, and Braulick hit her multiple times on the side of her face, breaking her glasses. Braulick then left the room.

Scott and Cheryl were able to get up and walk to the living room. Cheryl told Scott her face hurt, and Scott said he would take her to the doctor. Braulick then entered the living room with a knife in his hand. Scott recognized the knife as one Braulick had showed him before, "kind of a trick knife. You spin it a couple ways and it comes out, and then you spin it a couple times and it goes back in." Cheryl saw the knife and said, "Oh, no. Oh, no."

¶6 The scene that followed was harrowing. Scott and Braulick pursued each other to the dining room, and then the kitchen. Braulick cut a gash in Scott's abdomen, through which Scott could see his own intestines spilling out. He put his hand over his abdomen to hold them in. Braulick then attacked Cheryl, stabbing her in the side. He then grabbed her from behind and stabbed her again in the breast. Scott, fearing for Cheryl's life, let go of his abdomen so he could use both hands to get the knife away from Braulick. Scott somehow got the knife, and Braulick left. There was so much blood that Scott recalled they were "slipping and sliding" on the kitchen floor. Cheryl appeared to be looking for something in the kitchen, and Scott urged her to get out of the house. Scott found he could not open the back door because his hand was badly cut. He eventually managed to open the door and the couple ran outside, calling for help. Scott found Braulick's cell phone on the porch, but did not know how to work it. Cheryl, who remembers only "bits and pieces" of the events, then told Scott she had a cell phone in her pocket. She called 911.

¶7 Livingston Police Department Officers Steve Kunnath and Matthew Tubaugh and Park County Sheriff's Deputy Jason Hopkin and Sergeant Clay Herbst responded to the

4

call, arriving at the house almost simultaneously. They immediately saw Cheryl in front of the house, with her hands in the air, holding a cell phone. Cheryl said, "He stabbed me," and pointed to the back of the house. Hopkin remained in front with Cheryl while Kunnath, Tubaugh, and Herbst headed toward the back of the house. Hopkin looked around for signs of the direction the suspect may have fled, and observed a blood trail. He began following the blood trail, and saw a man approaching. The man was covered in blood and had a knife in his hand. Hopkin said the man "looked kind of like a zombie the way he was walking side to side, kind of stiff-legged, and he had a blank stare on his face." Believing the man was a suspect, Hopkin ordered him to drop the knife. When he did so, Hopkin approached and "saw his intestines coming out the side of his shirt." Hopkin realized the man was a victim, laid him on the ground, assessed his injuries, and applied compression to his abdominal wound. Hopkin called an ambulance and learned that the man was named Scott, and that he had been attacked by his step-son.

¶8 The other officers heard Hopkin's encounter with Scott and went to assist. They soon realized that Scott was not the suspect, and Herbst and Tubaugh left to search inside the house. Kunnath remained with Hopkin until the ambulance arrived, then went to the back yard to continue searching for the suspect. In the back yard, Kunnath saw a tall, dark figure approaching and thought it might be a neighbor coming out to see what was going on. He asked the person who he was. The person identified himself as Jeremy Braulick, held out a set of dog tags, and said, "I did it. I'm ready to go to jail." Braulick cooperated as Kunnath placed him in handcuffs and led him to the front of the house. Kunnath then turned on his audio recorder. Kunnath sat Braulick down on the front

steps, and asked, "So, Jeremy, what's going on?  What happened here?"  Braulick responded, "What happened?  I don't have a life, dude, and they want to talk to me like I'm a lowlife, and that's it.  I, I want a, I want an attorney and that's it."  Kunnath asked again, "Jeremy, what happened to your dad?  What happened to your step-dad?"  Braulick responded, "I don't know.  He's not my dad.  And I want to go.  I want to get out of here."  Kunnath told Braulick he would need to sit there.  Braulick then said, "I never assaulted anybody in my life until now, so."  Kunnath placed Braulick in a patrol car.

¶9　　Kunnath drove Braulick to the detention center and Tubaugh followed.  As the officers prepared to remove Braulick from the patrol car, another officer can be heard on the recording saying, "Find out how long he's been here.  If it's over 72 hours, add failure to register.  He should be in Bozeman.  He should have checked in with me, and he knows this."  At a pre-trial suppression hearing, Tubaugh testified that as Braulick was escorted into the holding area, Tubaugh detected a "clear odor" of alcohol and observed that Braulick appeared very distraught.  Mindful of the violent nature of the attack in the Kautzmans' house, Tubaugh also observed that Braulick was considerably larger than most of the officers.  Tubaugh approached Braulick in the holding area and said:

> I'm only going to tell you this one time, okay?  Because of the elevation of what's happened this evening, if you're not compliant, we're not going to mess around with you.  Do you understand?  That's not a threat, that, that's, that's just the way it's going to be.  Okay, so, you stay at this level, we are perfectly good.  Otherwise, we're going to go to an extreme level very quickly.  I appreciate your cooperation.  I just want you to understand that.

Tubaugh then asked Braulick how much alcohol he had consumed that day. He also asked Braulick how long he had been at the Kautzmans' house and whether he was just visiting or living there. Tubaugh advised Braulick he would be charged with two counts of aggravated assault, one of which may be increased to attempted homicide. He then said, "I'm not going to ask you any questions because I haven't Mirandized you. But when we get downstairs, if you want to talk to me, I'll talk to you."

¶10 Braulick was sobbing as he was taken from the holding area to the detention center. The officers did not question him at this time. Braulick continued to make unprompted exclamations, saying, "I don't care anymore, just give me my max time. I'm fucking tired, dude, I'm tired of fighting with people." He complained about the way his parents talked to him and the way he had been treated since leaving California, where he "had women that liked [him]," to come to Montana. He said, "But now I have, so now I'm fucking screwed, dude." He went on to complain about how he doesn't have any money, but people who do have money—specifically referencing O.J. Simpson and John "The Teflon Don" Gotti—murder people and get off "Scot free." Braulick was later read his *Miranda* rights by Detective Joseph Harris, and he declined to waive his rights and be interviewed.

¶11 Braulick was charged with two counts of attempted deliberate homicide, with a penalty enhancement for use of a dangerous weapon. Before trial, he moved to suppress statements made while in custody on the grounds that he was never informed of his right to remain silent, pursuant to *Miranda*, and that all questioning by law enforcement should have stopped when he asked for an attorney. The District Court held a suppression

7

hearing on September 10, 2012, hearing testimony from Kunnath, Tubaugh, Scott, and Cheryl. Kunnath testified that when he asked Braulick, "What happened to your step-dad," he was still not certain Braulick was the suspect. Kunnath was "trying to figure out what the whole situation was," particularly as other officers were still inside the house, and the 911 call had not included a report of how many people were present. Tubaugh testified that his questions about Braulick's drinking were part of the booking process, because heavily intoxicated persons may require medical clearance. Tubaugh also testified that he asked Braulick how long he had been staying at the Kautzmans' house because he wanted to know, for officer safety, if Braulick could have gone somewhere else during the time he left the scene or if there could be additional persons involved. On cross-examination, defense counsel pointed out that Tubaugh never asked Braulick how many people were at the house.

¶12 After the suppression hearing, the District Court adopted the State's proposed findings and conclusions as accurately stating the relevant facts and law. The District Court concluded there had been no custodial interrogation of Braulick, finding that his statements were spontaneously blurted while Braulick sobbed and talked to himself. The District Court did, however, order that Tubaugh's question about Braulick's alcohol consumption was to be "edited out of any tape and omitted from any testimony presented by the State," finding that the amount Braulick had been drinking was more prejudicial than probative. The trial began December 18, 2012, with Scott and Cheryl as the first and second witnesses, respectively. Braulick objected to allowing Cheryl to remain in the courtroom during Scott's testimony. The District Court ruled that as victims of a

8

criminal offense, both Scott and Cheryl had the right to be present for the trial. During Cheryl's testimony, the State asked her at several points if she recalled Scott's testimony and if it was accurate. Later in the trial, Kunnath testified and an audio recording made during his encounter with Braulick was played for the jury. Kunnath also read portions from a transcript of the recorded statements made by Braulick, including the statements, "I've never assaulted anybody in my life, until now," "I don't care anymore, just give me my max time," and "But now I have, so now I'm fucking screwed, dude." Tubaugh did not testify at trial. Braulick was convicted on both counts of attempted homicide and sentenced to a total of 90 years in the Montana State Prison.

## STANDARD OF REVIEW

¶13   On review of a district court's denial of a motion to suppress evidence, we review findings of fact for clear error and conclusions of law for correctness. *State v. Phillips*, 2013 MT 317, ¶ 15, 372 Mont. 317, 312 P.3d 445; *State v. Wheeler*, 2006 MT 38, ¶ 12, 331 Mont. 179, 134 P.3d 38. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court has misapprehended the effect of the evidence, or if our review of the record leaves us convinced that a mistake has been made. *Phillips*, ¶ 15; *Wheeler*, ¶ 12. It is within the province of the district court to determine the credibility of witnesses at a suppression hearing. *Phillips*, ¶ 19. Finally, we review the district court's interpretation of a statute for correctness. *Faulconbridge v. State*, 2006 MT 198, ¶ 24, 333 Mont. 186, 142 P.3d 777.

DISCUSSION

¶14    1. *Whether the District Court erred when it denied Braulick's motion to suppress spontaneous statements made after he was in custody, after he requested an attorney, and before he was notified of his Miranda rights.*

¶15    It has been well-established since *Miranda v. Arizona* that statements resulting from custodial interrogation of a defendant may not be used by the prosecution unless the defendant is informed, prior to questioning, that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney. *Miranda v. Ariz.*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966); *State v. Kelm*, 2013 MT 115, ¶ 29, 370 Mont. 61, 300 P.3d 687; *State v. Olson*, 2003 MT 61, ¶ 13, 314 Mont. 402, 66 P.3d 297. These rights stem from the constitutional guarantee that no person may be compelled in a criminal case to be a witness against him or herself. U.S. Const. amend. V; *State v. Morrisey*, 2009 MT 201, ¶ 29, 351 Mont. 144, 214 P.3d 708.

¶16    Braulick argues that his statements must be excluded because he was not given a *Miranda* warning. A *Miranda* warning is required only if the defendant is subject to custodial interrogation. *Olson*, ¶ 14. A person is in custody if he or she has been deprived of his or her freedom in any significant way, or his or her "freedom of action has been curtailed to a degree associated with a formal arrest." *Morrisey*, ¶ 37. This determination involves consideration of whether a reasonable person under the circumstances would have felt free to leave. *Morrisey*, ¶ 37. Interrogation includes "'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an

10

incriminating response from the suspect.'" *Olson*, ¶ 18. When analyzing whether words or actions are reasonably likely to elicit an incriminating response, the primary focus should be on the perceptions of the suspect, not the intent of the police. *Olson*, ¶ 18. An officer may, however, "'ask the detainee a moderate number of questions to determine the detainee's identity and to try to obtain information confirming or dispelling the officer's suspicions before the requirements of *Miranda* attach.'" *State v. Hurlbert*, 2009 MT 221, ¶ 34, 351 Mont. 316, 211 P.3d 869 (quoting *State v. Elison*, 2000 MT 288, ¶ 32, 302 Mont. 228, 14 P.3d 456). Further, a spontaneous or unsolicited remark, not made in response to interrogation, is admissible even without a *Miranda* warning. *State v. Johnson*, 177 Mont. 182, 187, 580 P.2d 1387, 1390 (1978).

¶17 Braulick also argues that his statements must be excluded because they were made after he attempted to invoke his right to counsel. *Miranda* recognized a right to counsel during custodial interrogation deriving from the Fifth Amendment protection against self-incrimination. *Miranda*, 384 U.S. at 469-70, 86 S. Ct. at 1625-26; *State v. Scheffer*, 2010 MT 73, ¶¶ 16-17, 355 Mont. 523, 230 P.3d 462. This right is distinct from the Sixth Amendment right to counsel, which attaches only after commencement of a criminal prosecution. *Scheffer*, ¶¶ 16-17. Once a defendant has invoked the right to have counsel present during custodial interrogation, the interrogation must end. *State v. Main*, 2011 MT 123, ¶ 15, 360 Mont. 470, 255 P.3d 1240; *Scheffer*, ¶ 17. Like the other requirements of *Miranda*, however, this applies only to interrogation and does not require exclusion of a defendant's spontaneous statements. *Edwards v. Ariz.*, 451 U.S. 477,

484-86, 101 S. Ct. 1880, 1885 (1981).  Even after an accused has invoked the right to counsel,

> nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial.  The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that [the accused] invoked . . . .

*Edwards*, 451 U.S. at 485-86, 101 S. Ct. at 1885.  Thus, under either theory presented by Braulick, the dispositive question is whether he was subject to custodial interrogation.

¶18    On appeal, the State argues that Braulick was not in custody when he was handcuffed in front of the Kautzmans' home.  In the District Court, the State conceded on multiple occasions that there could be no dispute that Braulick was in custody. Moreover, we have no difficulty concluding that Braulick was in custody when he was handcuffed, led to another area by a law enforcement officer, and told, in response to his specific request to "get out of here," that he could not leave.  Under such circumstances, Braulick's freedom was curtailed to a degree normally associated with formal arrest. *Morrisey*, ¶ 37.

¶19    We next address whether Braulick's statements were the product of interrogation. After Braulick was in custody, Kunnath asked him two direct questions: "So, Jeremy, what's going on?  What happened here?" and "Jeremy, what happened to your dad? What happened to your step-dad?"  Kunnath testified that at that point, he and other officers on the scene did not understand what had happened or how many people may have been involved.  Kunnath's testimony is supported by the fact that moments earlier,

12

Hopkin had attempted to detain Scott, who was severely injured, as a possible suspect. Scott and Braulick were both covered in blood and found wandering around outside the home. Kunnath's limited questioning was a reasonable effort to obtain information confirming his suspicions about events at the scene. *Hurlbert*, ¶ 34 (quoting *Elison*, ¶ 32). The requirements of *Miranda* did not yet attach. Further, Kunnath stopped questioning Braulick after asking him what happened to his step-dad, but Braulick continued to make unprompted statements, including "I never assaulted anybody in my life until now, so." This statement was not in response to interrogation, and was therefore admissible in the absence of a *Miranda* warning. *Johnson*, 177 Mont. at 187, 580 P.2d at 1390.

¶20 On appeal, Braulick also refers to his exchange with Tubaugh in the holding area, but Tubaugh did not testify at trial and no transcript of the interaction was read at trial. The conversation is included on an audio recording that was played for the jury, but it is not clear from the record before us which portions of the audio were actually played. Statements of counsel immediately before trial indicate that the recording had been redacted, but that it could be manually paused in the courtroom if the redacted portions were to play accidentally. The audio recording contained in the District Court record includes Tubaugh's question about Braulick's alcohol consumption, which the District Court specifically ordered excluded. Because the record does not reflect any objection to excluded portions of the audio recording being improperly played for the jury, it appears that the exhibit filed may not be an accurate reflection of what the jury actually heard.

We caution counsel that such confusion regarding exhibits complicates this Court's review.

¶21 We assume for the moment that Tubaugh's exchange with Braulick in the holding area was introduced at trial. The District Court concluded that the two questions asked by Tubaugh, relating to Braulick's alcohol consumption and place of residence, did not constitute interrogation.[1] Braulick's argument is not that the statements resulting from his exchange with Tubaugh should themselves have been excluded, but that all statements made by Braulick at any time after he invoked his right to counsel, whether spontaneous or not, should have been excluded. This is a misunderstanding of the law under *Miranda*, which does not mandate the exclusion of a defendant's spontaneous outbursts. *Johnson*, 177 Mont. at 187, 580 P.2d at 1390. Braulick made several spontaneous statements after leaving the holding area and while officers were discussing how to proceed with booking. He was not asked any questions during this time and his outbursts, including "I don't care anymore, just give me my max time," and "But now I have, so now I'm fucking screwed, dude," were not in response to any statements or questions from officers. The District Court found that in his distressed state, Braulick was simply talking to himself. His statements did not stem from the exchange with Tubaugh in the holding area, were not in response to interrogation, and need not be excluded under the *Miranda* rule. *Johnson*, 177 Mont. at 187, 580 P.2d at 1390.

---

[1] Given the instruction to "find out how long he's been here . . . and add failure to register," we are skeptical of Tubaugh's testimony at the suppression hearing that he asked Braulick about his residence for reasons relating to officer safety. Nevertheless, the intent of the officer is not the relevant factor in our inquiry. *Olson*, ¶ 18. Further, we must defer to the judgment of the District Court regarding the credibility of witnesses. *Phillips*, ¶ 19.

14

¶22 The procedural safeguards of *Miranda* exist to protect accused persons from the coercive effects of custodial interrogation. *Miranda*, 384 U.S. at 445-46, 86 S. Ct. at 1612-13. They do not exist to grant a suspect in a criminal investigation license to spontaneously blurt incriminating statements without fear of recrimination. That Braulick did not receive the benefit of his Fifth Amendment privilege against self-incrimination is attributable to his own actions, not those of law enforcement. The District Court did not err when it denied Braulick's motion to suppress his spontaneous statements.

¶23 *2. Whether the District Court erred when it denied Braulick's motion to exclude one of the victims of the crime from the courtroom.*

¶24 Ordinarily, when asked to do so by one of the parties, a court must order witnesses excluded from the courtroom so that they cannot hear the testimony of other witnesses. M. R. Evid. 615. The court may also order the exclusion of witnesses on its own motion. M. R. Evid. 615. By statute, however, the victim of a crime has the right to be present during trial, and may not be excluded from the trial solely because he or she will also be called as a witness. Section 46-24-106(1), MCA. A victim may be excluded only if the trial court finds specific facts supporting exclusion, for disruptive conduct, or from portions of a trial or hearing dealing with sensitive matters personal to a youth. Section 46-24-106(2), MCA. A family member of a victim also may not be excluded solely because he or she is to be called as a witness. Section 46-24-106(4), MCA. A family member may be excluded only upon a showing that the family member's testimony will be directly relevant to the guilt or innocence of the defendant, or that the defendant's

15

right to a fair trial will be jeopardized if the family member is not excluded. Section 46-24-106(4), MCA.

¶25 Scott and Cheryl were both victims of the crime, and testified as the State's first and second witnesses, respectively. Prior to trial, the State notified the court that both Scott and Cheryl intended to be present for the full proceedings. Braulick moved to have Cheryl excluded from the courtroom during Scott's testimony, pursuant to M. R. Evid. 615. The District Court responded that as a victim of the crime, Cheryl had a statutory right to be present during the trial. Braulick did not argue that there were any specific facts supporting Cheryl's exclusion, and instead offered only a conclusory argument that "to let them just sit and listen to all of the evidence before they testify is highly prejudicial to the defendant." Section 46-24-106, MCA, contemplates more than a broad allegation of prejudice. The party moving for exclusion of the victim must produce specific facts demonstrating that exclusion is warranted. *See, e.g.*, *Lockhead v. Weinstein*, 2001 MT 132, ¶ 10, 305 Mont. 438, 28 P.3d 1081 (burden of proof is on the moving party). No effort to produce such facts was made here. On appeal, Braulick argues that the State improperly asked Cheryl to comment on the accuracy of Scott's testimony and used references to Scott's testimony to "tailor" Cheryl's testimony. Braulick did not object to this line of questioning during trial, and has thus waived his right to raise the issue on appeal. *State v. Adgerson*, 2003 MT 284, ¶ 12, 318 Mont. 22, 78 P.3d 850 (*overruled in part on other grounds by Whitlow v. State*, 2008 MT 140, ¶ 20, 343 Mont. 90, 183 P.3d 861). The manner in which the State questioned Cheryl, and Braulick's motion to exclude Cheryl during the testimony of other witnesses, are distinct

and separate issues. Braulick inappropriately conflates the two and attempts to use the State's questions to Cheryl to belatedly manufacture the required specific facts in support of exclusion. The District Court correctly concluded that the plain statutory language of § 46-24-106, MCA, was applicable.

**CONCLUSION**

¶26 Braulick's spontaneous statements made to or within the hearing of law enforcement officers after he was taken into custody and after he requested an attorney were not in response to interrogation, and therefore, *Miranda* does not mandate their exclusion. Braulick failed to produce specific facts supporting the exclusion of a victim who was also a witness from the courtroom. We affirm.


                                        /S/ LAURIE McKINNON

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JAMES JEREMIAH SHEA